IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2008

## STATE OF TENNESSEE v. MERL WAYNE MEDLEY

**Direct Appeal from the Circuit Court for Obion County**
**No. C07-176, C07-177, CC-07-CR233    William B. Acree, Jr., Judge**

---

**No. W2008-00831-CCA-R3-CD  - Filed November 30, 2009**

---

In Cause C07-176, the Defendant-Appellant, Merl Wayne Medley, was convicted by an Obion County jury of two counts of attempted first degree murder, Class A felonies, and two counts of aggravated assault, Class C felonies. In the same cause, Medley was also found guilty through a bench trial of one count of retaliation for past action, a Class E felony, and one count of violation of an order of protection, a Class A misdemeanor. In Cause C07-177, Medley was convicted by a jury of one count of aggravated assault, a Class C felony, and one count of simple assault, a Class A misdemeanor. In Cause CC-07-CR-233, Medley was convicted by a jury of one count of solicitation to commit first degree murder, a Class B felony. In Cause C07-176, one of the convictions for attempted first degree murder and both of the convictions for aggravated assault were merged into the remaining conviction for attempted first degree murder, for which Medley received a twenty-five-year sentence at 30%. He also received a sentence of two years at 30% for the retaliation for past action conviction and a sentence of eleven months and twenty-nine days for the violation of an order of protection conviction, which were to be served concurrently with the attempted first degree murder conviction. In Cause C07-177, the assault conviction was merged into the aggravated assault conviction, for which Medley received a six-year sentence at 30%. In Cause CC-07-CR-233, Medley received a twelve-year sentence at 30% for the solicitation to commit first degree murder conviction. The trial court ordered that the twenty-five-year sentence for the attempted first degree murder conviction, the twelve-year sentence for the solicitation to commit first degree murder conviction, and the six-year sentence for the aggravated assault conviction be served consecutively for an effective sentence of forty-three years. In this appeal, Medley challenges the trial court's (1) refusal to suppress his statement, (2) joinder of the offense of solicitation to commit first degree murder to the offenses of attempted first degree murder and aggravated assault; and (3) imposition of consecutive sentences. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Joseph P. Atnip, District Public Defender (on appeal), Dresden, Tennessee, and James Powell (at trial), Union City, Tennessee, for the Defendant-Appellant, Merl Wayne Medley.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy E. Wilber, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Prior to trial, Medley filed a motion to suppress his September 10, 2007 statement to law enforcement, which the trial court denied. Also prior to trial, the State filed a motion to join Cause CC-07-CR-233 to Causes C07-176 and C07-177 pursuant to Tennessee Rules of Criminal Procedure 8 and 13, which the trial court granted. On February 1, 2008, the trial court sentenced Medley to twenty-five years for the attempted first degree murder, twelve years for the solicitation to commit first degree murder, and six years for the aggravated assault. Medley filed a motion for a new trial on February 27, 2008. The trial court denied this motion by written order on June 6, 2008, and Medley filed a timely notice of appeal.

## FACTUAL BACKGROUND

On April 17, 2007, Medley called his wife and the victim in this case, Angela Medley, at work to inform her that he had picked up their daughter from daycare and that he wanted her to gather her belongings because he was forcing her to move out of their home. The victim immediately called the daycare to see if Medley had already picked up their daughter. She was told that her daughter was still there, and the victim drove to the daycare to pick her up. As she was on her way, Medley called the victim a second time and told her to "get to the daycare" and remove Sheila Jackson's name from the list of individuals who were authorized to pick up their daughter from daycare.

The victim then called Sheila Jackson and requested that she contact the Obion County Sheriff's Department and tell them to drive over to her home. The victim told Jackson that she felt like she needed protection from Medley because he had already told her that "he was going to throw [her] out if he didn't kill [her] before [she] got [her] things packed."

When the victim arrived at the daycare, Medley became enraged and demanded that she remove her two adult daughters and her parents from the list of people authorized to pick up their daughter. Medley then accused her of having an affair with a Mexican immigrant, which the victim adamantly denied. Medley told the victim to get in her car and go home. Medley put their daughter in his vehicle for the ride home.

The victim followed Medley home. During that time, the victim called Jackson again to ensure that deputies would be at their home when they arrived. Upon their arrival at home, Medley came over to the victim's car, opened her door, and then broke her cell phone in half, saying, "Now call for help[.]" Medley threw the broken cell phone at her, which hit her on the arm. He then pulled a gun out from behind his back and began screaming at the victim. Medley pointed the gun at the victim's forehead and chest before firing a shot over her head and next to her foot. He told the victim to go pack her belongings. Medley continued to hold the gun as he followed her into the

house and shoved her into the refrigerator. Then he hit the victim in the head with his hand. Medley told her that he was going to kill her if she tried to get someone to help her.

Medley then told the victim to sit at a picnic table outside and watch their daughter play. He put the gun on the seat of the picnic table between him and the victim. He told the victim to call Jackson and tell her to never call her again. The victim called Jackson on Medley's cell phone and relayed this message. Medley said a few things to Jackson before firing a shot near the phone.

Jackson observed Medley shoot his gun near the phone during their conversation as she pulled into Medley's driveway. Simultaneously, Sergeant Greg Hamilton of the Obion County Sheriff's Department drove into the Medley's driveway. The victim pleaded with Medley not to hurt her or their daughter when she saw the officer. Medley said, "There's your help," and walked to the back of their home.

Because the victim believed that Medley was going to shoot her before Sergeant Hamilton made it up the driveway, she ran to a shed in the back yard. Then she ran to Sergeant Hamilton as he was getting out of his vehicle. Medley brought his daughter to the other officers and starting talking with them.

Medley told Sergeant Hamilton that a gun had not been involved in the incident and claimed that all of his guns were locked in a gun safe because of his young daughter. Deputy Josh Johnson, another officer on the scene, found Medley's loaded gun, a nine millimeter semi-automatic, in a cardboard box on the kitchen table. Once the gun was discovered, Medley suddenly "changed his story" and claimed that he had gotten the gun out earlier that day and had forgotten to return it to the gun safe. Deputy Johnson also found a spent shell casing near the victim's car that appeared to have landed there after the victim parked her car that day.

The victim completed a petition for an order or protection while some of the officers talked to Medley. The officers arrested Medley after talking to him for thirty minutes. The victim subsequently attended several court appearances, and a court issued the final order of protection to her on April 26, 2007.

On May 24, 2007, Medley attacked the victim when she went outside her home to lock her truck. When she went outside, the victim saw Medley standing on the other side of her truck behind a tree. Medley approached the victim and told her, "You've cost me too much, bitch, and you're going to die." Medley demanded that the victim drop all of the charges against him, and the victim said that she would. Medley told her that it was "too late," and the victim saw the knife in Medley's hand. Medley pulled the victim's shirt over her head from behind, grabbed her arm, and cut her on her face, chest, shoulder, down one breast, twice on her left hand, and on her arm to her left shoulder. The victim could not remember whether Medley stopped cutting her or she was able to get away from him. She ran to the back door of her home, locked and chained the door, locked herself and her daughter in the bedroom, and called 9-1-1. While she was on the line with 9-1-1, she called Sheila Jackson on another phone screaming for help. The victim told Jackson that Medley had cut her. The victim was bleeding heavily from gaping wounds. Deputy Kenny Craig, one of the first officers to arrive at the victim's house, stated that he saw blood on the back door of the house, the deck, and all over the house. Inside he found the victim, who had wrapped herself in a blanket.

Deputy Craig said that when emergency personnel pulled off the blanket, the victim's wounds were so deep that he believed that the victim would die.

Once the victim was in the care of medical personnel, Deputy Craig went to Medley's residence. He said Medley had cuts on his hands, which Medley claimed were from moving an air conditioner. Medley also claimed that he had not left his residence that night except to go to Walmart with his girlfriend, Billie Sullivan. Sullivan initially corroborated Medley's story about his whereabouts that night. However, she later informed the sheriff's department that Medley had driven her to the victim's home and asked her to drive his car down the road and return a few minutes later so that he could slash the victim's tires the night the victim was injured.

The officers that searched Medley's residence found a soaking wet black T-shirt and some jeans with apparent blood stains containing Medley's wallet and keys. The officers also found a pocketknife and sharpening stone in Medley's car. Forensics tests of the stains on the jeans showed that they were from the blood of the victim.

Between July and September 2007, Medley began discussing his criminal case with Antonio Goss, a fellow inmate at the Union City Jail. Medley asked Goss what would happen in his case if the victim failed to appear in court. Goss told Medley that if the victim did not show up that Medley would have an excellent chance of "getting off." Medley "made it perfectly clear that he wanted to have [the victim] killed[,]" but Goss told him that he should leave things alone. Goss stated that he thought Medley talked to him about having his wife killed because he thought that Goss could help him since Goss had been an member of the Gangster Disciples in Memphis before his imprisonment. Goss immediately contacted Agent Jeff Jackson with the Tennessee Bureau of Investigation because he thought that Medley was trying to implicate him. After talking with Agent Jackson, Goss agreed to wear a wire and taped two different conversations with Medley. During the first conversation, Medley talked to Goss about having an acquaintance of Goss's kill his wife in exchange for $2000. During the second conversation, Medley and Goss talked about how the hired killer would recognize the victim and how the killer would get paid. Medley wrote an IOU note to Goss that stated, "I, Merl, owe Antonio Goss." Medley admitted to Agent Jackson that he wrote the IOU note but claimed that he owed Goss money for some games that he had given him.

**I. Suppression of Defendant's Statement.** Medley contends that his September 10, 2007 statement regarding the uncharged offense of solicitation to commit murder should have been suppressed as violating the Fifth and Sixth Amendments, especially in light of the trial court's decision to join the solicitation to commit murder offense with the attempted murder and aggravated assault offenses. He asserts that his statement should have been suppressed because he explicitly invoked his Fifth Amendment right to counsel under Miranda, because he was represented by counsel on other charges at the time he made the statement, and because law enforcement initiated contact with him in jail. In response, the State argues that the trial court properly refused to suppress Medley's statement on Fifth Amendment and Sixth Amendment grounds. Specifically, the State contends that the trial court properly refused to suppress the statement on Fifth Amendment grounds because it "accredited Agent Jackson's testimony that he had issued a verbal Miranda warning to the defendant prior to the statement." The State also argues that the trial court properly refused to suppress the statement on Sixth Amendment grounds "because the United States Supreme Court has held that the right to counsel is offense specific and applies only when a defendant has been charged

with the offense." As noted by the State in its brief, Medley's motion to suppress did not specify the statement he wished to suppress; instead, the motion identified it only as "a statement given by the Defendant to TBI Agent Jeff Jackson, as well as Obion County Sheriff Deputy Angie Taylor, in which the Defendant was questioned about an attempt to solicit the murder of the Defendant's wife." Furthermore, neither Medley nor the State identified the specific statement at issue at the suppression hearing.

At the suppression hearing on November 16, 2007, Special Agent Jeff Jackson and Investigator Angie Taylor testified for the State. Medley, the Defendant-Appellant, testified for the defense. During opening arguments, defense counsel acknowledged that he had not found a case directly on point but relied on State v. Ernest Jay Walker, 1993 WL 44195, at *7 (Tenn. Crim. App., at Knoxville, Feb. 22, 1993), which states that once a defendant invokes his right to counsel under the Fifth Amendment during an interrogation, the prophylactic rule of Edwards is triggered, and the police must refrain from further interrogation until counsel for the defendant is present. In response, the State asserted that it relied on McNeil v. Wisconsin, 501 U.S. 171, 177-79, 111 S. Ct. 2204, 2208-09 (1991), which held that when a defendant invokes the offense-specific Sixth Amendment right to counsel during a proceeding as to a charged offense, it is not also considered an invocation of the defendant's non-offense-specific Fifth Amendment right to counsel under Miranda and Edwards as to other uncharged offenses. The State also said it relied on Texas v. Cobb, 532 U.S. 162, 172-73, 121 S. Ct. 1335, 1343-44 (2001), which held that the Sixth Amendment right to counsel on charged offenses does not prevent law enforcement from interrogating a defendant regarding other uncharged offenses.

Special Agent Jeff Jackson with the Tennessee Bureau of Investigation (TBI) testified that he questioned Medley on September 10, 2007. He said that he did not record the interview because it was not the policy of the TBI to tape-record interviews. Instead, Agent Jackson said that he summarized Medley's statement in his report. He stated that on September 10, 2007, he verbally advised Medley of his Miranda rights and handed Medley a written waiver of his Miranda rights. Agent Jackson said that Medley did not sign the written waiver:

> When I was reading his rights to him, I had Investigator Taylor, who's with the Obion County Sheriff's Department, come into the room to witness this with me, so I would have someone else's viewpoint there. As I finished reading the form to him – as you've mentioned, the cases are closely related. I asked him not to discuss the case that he was represented by counsel on, and told him that I'm not – I made it clear to him, at least three separate times, that I'm not here to talk to [him] about that case, and don't bring anything up about that. I told him that I was there to talk to him about a recording, and he cut me off and started talking about it.

Agent Jackson said that Medley suddenly interjected, "I know exactly what this is about. This is about Antonio Goss wearing a wire and having a conversation with me in the jail." Agent Jackson responded, "Yes, sir, that is what I want to talk to you about." He said that Medley immediately began talking about the conversation he had with Goss in jail. Agent Jackson "didn't cut him off" because he "wanted to hear what [Medley] had to say." He acknowledged that he did not tell Medley to wait and sign the written waiver before he started talking. He also admitted that it would have

-5-

been advantageous for Medley to have signed the written waiver before giving his statement. However, he said, "I can tell you that I Mirandized [sic] him, and I had a witness that can verify that I Mirandized [sic] him, and once an individual starts talking about a case this serious, I try not to cut them off. I try to gain as much evidence as possible." Agent Jackson said that he did not mention the name of Medley's defense attorney until he arrived at the Obion County Sheriff's Department. He also stated that Medley did not mention the name of his attorney during the interview.

Agent Jackson said that Medley's statement regarding the solicitation to commit murder charge would be offered by the State at trial. He said that Medley never told him that he was represented by counsel and never said he wanted to talk to his attorney before making his statement. Agent Jackson stated that he did not tell Medley that his attorney was coming to the sheriff's department to talk to him that day.

The trial court asked Agent Jackson what Medley said to him during the interview. Agent Jackson explained that they discussed whether Medley wrote an IOU note to Antonio Goss, another inmate, that was related to the solicitation to commit murder charge. Agent Jackson told the trial court that he summarized Medley's statement in his report. The trial court asked to see Agent Jackson's summary of Medley's statement and reviewed it briefly during the hearing. The statement was not read into evidence and was not admitted as an exhibit at the suppression hearing. However, at trial, Agent Jeff Jackson testified that Medley admitted to writing the IOU note to Antonio Goss but claimed that he owed Goss money for some games that Goss had given him. We conclude based on the record before us that the statement Medley sought to suppress was his discussion with Agent Jackson admitting to writing the IOU note.

Angie Taylor, an investigator with the Obion County Sheriff's Department, testified that she was present on September 10, 2007, when Agent Jackson questioned Medley. She stated that she came into the interview room immediately after Medley. Investigator Taylor stated she witnessed Agent Jackson read Medley his Miranda rights and ask him to sign the written waiver. She stated that Medley did not sign the written waiver but was not sure why he did not sign it. She said that after Special Agent Jackson read Medley his Miranda rights, "Mr. Medley then spoke up and said, 'I know why you're here.'" Investigator Taylor stated that during the interview, Medley never stated that he was represented by an attorney and never asked to speak with his attorney. She added, "Special Agent Jackson did advise [Medley] that he knew that he had counsel on a previous charge that he was incarcerated for and asked him not to speak about that particular case."

Merl Medley, the Defendant-Appellant, testified that Special Agent Jackson questioned him in Investigator Taylor's presence on September 10, 2007. Medley explained what happened in the interview room:

> [Special Agent Jackson] said that he knew that I was represented by [defense counsel] on another case, and that – like he said, he didn't want to discuss that case, but he wanted to – he had that piece of paper that he wanted me to sign. And I said I didn't want to sign anything or say anything [until] my attorney got there.

Medley said that Agent Jackson told him that his defense attorney would be there that day to talk to him. Regarding the waiver, Medley stated:

> [Agent Jackson] slid the paper across, said he needed me to sign. He said, "[These are] your rights. Do you understand them?" He said, "I want you to read them." And as I was looking down and reading it, I was moving my lips, and he said, "I know you've read it, because I [saw] your lips move."

Medley told Agent Jackson that he "wasn't going to sign anything [ until he] talked to [his attorney]." He added, "I never did sign the paper. [Agent Jackson] said, 'I suppose you know what this is about?' And I said, 'Yes, it's about [Antonio Goss] wearing that wire in the jail cell that day.'" Agent Jackson responded, "You're absolutely correct, [Goss] wore a wire." Then Investigator Taylor informed Agent Jackson that Medley's attorney had arrived, and Agent Jackson told defense counsel to come into the interview room, which brought the interview to an end.

> The Court then asked the following question of Medley during his testimony:

> What all was said between you and . . . Special Agent Jackson after you told him you didn't want to talk to him until [your] attorney got there? Did he ask you anything else or say anything to you, did you say anything to him, or just sit there; what happened?

Medley responded, "[Agent Jackson] just wanted to know what . . . was said [between Antonio Goss and me] and what was done, if I said anything like this or I said anything like that, or if I paid anybody this or I paid anybody for that." Medley confirmed that he did talk to Agent Jackson regarding his interaction with Antonio Goss.

> At the conclusion of the hearing, the court ruled:

> I'm going to reserve judgment on the Sixth Amendment issue. I want to read Texas v. Cobb. And also, I want to hear the motion to join, and . . . the disposition of that motion might have some bearing on it.

> As far as the Fifth Amendment issue, the Court finds as a matter of fact that . . . Special Agent Jackson . . . gave the written waiver to Mr. Medley, and before Mr. Medley could sign it, Mr. Medley began talking, and the Court finds – accepts Officer Jackson's testimony that Mr. Medley did not tell him that he didn't want to talk until his attorney got there. In short, I accept Officer Jackson's version of the facts in that regard.

> Mr. Medley has been held in jail for a long period of time. He's charged with a very serious crime. And if Mr. Medley had said – if he in fact had said, "I don't want to talk to you until my attorney gets here," – I think he's been seasoned enough to know that he could have done that and didn't have to talk. It's just a matter of common sense, and it seems to me to be more likely that Officer Jackson's version

is true, that Mr. Medley just started talking and he listened to what he said. So, in short, or in summary, the Court finds there is no Fifth Amendment violation.

I will reserve judgment and issue a decision in a day or two about the Sixth Amendment issue.

The trial court's November 19, 2007 written order denying Medley's motion to suppress held that Medley's Sixth Amendment rights were not violated in light of Texas v. Cobb, 532 U.S. 162, 121 S. Ct. 1335 (2001).

The courts of this state have concluded that "a trial court's determination at a suppression hearing is presumptively correct on appeal." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citing State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986)). However, if the record on appeal preponderates against the trial court's determination, then the presumption of correctness may be overcome. Harbison, 704 S.W.2d at 318 (citing Mitchell v. State, 458 S.W.2d 630, 632 (Tenn. Crim. App. 1970)). This standard was explained in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

928 S.W.2d 18, 23 (Tenn. 1996).

This court's analysis regarding Medley's September 10, 2007 statement regarding the IOU note must begin with the United States Constitution and the Tennessee Constitution. The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "Encompassed within both of these constitutional provisions is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation." Saylor, 117 S.W.3d at 244.

In Miranda v. Arizona, the United States Supreme Court generally stated that the right to counsel was invoked when an individual "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking . . . ." 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612 (1966). However, eight years later in Davis v. United States, the United States Supreme Court adopted a significantly narrower standard for invoking a right to counsel under the Fifth Amendment when it held that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance

of an attorney.'" 512 U.S. 452, 458-59, 114 S. Ct. 2350, 2355 (1994) (quoting McNeil, 501 U.S. at 178, 111 S. Ct. at 2209).

Whenever a suspect invokes his right to counsel "during police-initiated custodial interrogation," law enforcement must stop questioning until the suspect's attorney is present. Saylor, 117 S.W.3d at 244 (citing Miranda, 384 U.S. at 444-45, 86 S. Ct. at 1612; Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1885; State v. Stephenson, 878 S.W.2d 530, 548 (Tenn. 1994)). An invocation of the right to counsel may be made "in any manner and at any stage of the process." Miranda, 384 U.S. at 444-45, 86 S. Ct. at 1612. Once the suspect invokes his right to counsel, "any subsequent statement made by a defendant as a result of police-initiated interrogation must be suppressed." State v. Carrie Ann Brewster and William Justin Brewster, No. E2004-00533-CCA-R3-CD, 2005 WL 762604, at *6 (Tenn. Crim. App., at Knoxville, Apr. 5, 2005) (citing Edwards, 451 U.S. at 487, 101 S. Ct. at 1886). Once the right to counsel attaches, only the suspect can initiate further communication with law enforcement. Edwards, 451 U.S. at 484-85, 101 S. Ct. at 1885.

Any waiver of Miranda rights must be "made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. A court must look to the totality of the circumstances in determining whether a defendant has validly waived his Miranda rights. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992) (citing Oregon v. Elstad, 470 U.S. 298, 318, 105 S. Ct. 1285, 1298 (1985); State v. Kelly, 603 S.W.2d 726, 728-29 (Tenn. 1980)), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 306 (Tenn. 2002).

Unlike the Fifth Amendment, the Sixth Amendment ensures that "in all criminal prosecutions, the accused that shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. In Tennessee, the Sixth Amendment "right to counsel attaches when adversary judicial proceedings are initiated." State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980). "Initiation is marked by formal charge, which we construe to be an arrest warrant, or at the time of the preliminary hearing in those rare cases where a preliminary hearing is not preceded by an arrest warrant, or by indictment or presentment when the charge is initiated by the Grand Jury." Id. (internal footnote omitted).

Recently, in Montejo v. Louisiana, the United States Supreme Court overruled Michigan v. Jackson, 475 U.S. 625, 106 S. Ct. 1404 (1986), which prevented law enforcement from initiating an interrogation of a defendant after the defendant had requested counsel at an arraignment or similar hearing, and concluded that the purpose of the Jackson rule was met by the protections given by Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981), and Minnick v. Mississippi, 498 U.S. 146, 111 S. Ct. 486 (1990):

> These three layers of prophylaxis are sufficient. Under the Miranda-Edwards-Minnick line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the Miranda warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. If that regime suffices to protect the integrity of "a suspect's voluntary choice not to speak outside his lawyer's presence" before his arraignment, Cobb, 532 U.S., at 175, 121 S. Ct.

1335 (KENNEDY, J., concurring), it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached.

Montejo v. Louisiana, — U.S. — , 129 S. Ct. 2079, 2090 (2009).

"Under our precedents, once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings." Montejo, — U.S. — , 129 S. Ct. 2079, 2085 (citing United States v. Wade, 388 U.S. 218, 227-228, 87 S. Ct. 1926, 1932-33 (1967); Powell v. Alabama, 287 U.S. 45, 57, 53 S. Ct. 55, 59-60 (1932)). Interrogation by the State is considered a "critical" stage of the criminal proceedings. Id. (citing Massiah v. United States, 377 U.S. 201, 204-205, 84 S. Ct. 1199, 1202-03 (1964); United States v. Henry, 447 U.S. 264, 274, 100 S. Ct. 2183, 2189 (1980)). The Court in Montejo also emphasized a defendant's ability to waive his Sixth Amendment right to counsel:

> Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. Patterson v. Illinois, 487 U.S. 285, 292, n. 4, 108 S. Ct. 2389, 101 L. Ed.2d 261 (1988); Brewer v. Williams, 430 U.S. 387, 404, 97 S. Ct. 1232, 51 L. Ed.2d 424 (1977); Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. Michigan v. Harvey, 494 U.S. 344, 352-353, 110 S. Ct. 1176, 108 L. Ed.2d 293 (1990). And when a defendant is read his Miranda rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the Miranda rights purportedly have their source in the Fifth Amendment:

>> "As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in Miranda . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."

> Patterson, supra, at 296, 108 S. Ct. 2389.

Montejo, — U.S. — , 129 S. Ct. at 2085.

Sepulveda v. State reiterated the limited scope of the Sixth Amendment:

> The Sixth Amendment right . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings–whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

90 S.W.3d 633, 638 (Tenn. 2002) (quoting McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991) (internal quotations omitted)).

Here, Medley argues that the trial court should have suppressed his statement regarding the IOU note because he explicitly invoked his Fifth Amendment right to counsel during his interview with Agent Jackson. He also claims that he had previously invoked his right to counsel under both the Fifth and Sixth Amendments at the point when he hired private counsel on the related case involving the attempted murder charges. We conclude that the record does not preponderate against the trial court's refusal to suppress Medley's statement. Here, the trial court made a finding of fact that it accredited Agent Jackson's testimony, which showed that Medley waived his Miranda rights under the Fifth Amendment. The trial court also ruled that Medley's Sixth Amendment right to counsel was not violated in light of Texas v. Cobb, 532 U.S. at 172-73, 121 S. Ct. at 1343-44, which held that the Sixth Amendment right to counsel on charged offenses does not prevent law enforcement from interrogating a defendant regarding other uncharged offenses. Regarding Medley's claim that invoked his right to counsel under the Fifth and Sixth Amendments when he hired private counsel on the attempted murder charges, we note the United States Supreme Court's ruling in McNeil:

> To invoke the Sixth Amendment interest is, as a matter of fact, not to invoke the Miranda-Edwards interest. One might be quite willing to speak to the police without counsel present concerning many matters, but not the matter under prosecution. It can be said, perhaps, that it is likely that one who has asked for counsel's assistance in defending against a prosecution would want counsel present for all custodial interrogation, even interrogation unrelated to the charge. That is not necessarily true, since suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions. But even if it were true, the likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards. The rule of that case applies only when the suspect "ha[s] expressed " his wish for the particular sort of lawyerly assistance that is the subject of Miranda. Edwards, supra, 451 U.S., at 484, 101 S. Ct., at 1884 (emphasis added). It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting the assistance of an attorney at a bail hearing does not bear that construction. "[T]o find that [the defendant] invoked his Fifth Amendment right to counsel on the present charges merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard the ordinary meaning of that request." State v. Stewart, 113 Wash.2d 462, 471, 780 P.2d 844, 849 (1989), cert. denied, 494 U.S. 1020, 110 S. Ct. 1327, 108 L. Ed.2d 502 (1990).

McNeil, 501 U.S. at 178-79, 111 S. Ct. at 2209. Medley's invocation of his Sixth Amendment right to counsel, at the point when he hired private counsel to represent him on the attempted murder charges, was not also an invocation of his Fifth Amendment right to counsel under Miranda and Edwards as to other uncharged offenses. See McNeil, 501 U.S. at 177-79, 111 S. Ct. at 2208-09;

-11-

see also Cobb, 532 U.S. at 172-73, 121 S. Ct. at 1343-44. Accordingly, Medley is not entitled to relief on this issue.

**II.  Joinder of Offenses.**  Medley contends that the trial court erred in joining the offenses in this case in light of its refusal to suppress his statement regarding the IOU note. Medley claims that his statement should not have been admissible on Fifth and Sixth Amendment grounds in the attempted murder case, if this case had been tried alone, because he was represented by counsel on related charges and because law enforcement approached him rather than Medley approaching law enforcement. He contends that since the statement should not have been admissible in the attempted murder case, then by implication, the statement should not have been admissible when the attempted murder case was joined to the other cases. In response, the State contends that the trial court did not err in joining the offenses because it "properly determined that the evidence of the defendant's three separate offenses would be admissible in separate trials because the evidence was relevant to whether the defendant intended to harm Ms. Medley."

The hearing on the State's motion to join offenses occurred on November 16, 2007. The State argued that the offenses should be joined because:

> [T]he evidence of the crime on the solicitation is going to be admissible at the trial on the attempted murder. . . . [W]e think that it will come in . . . for the following reasons:  He is charged with attempted first degree murder, which means that he had to have the intent and the premeditation to kill Angela Medley on the date for which he is charged."

The State argued that their case would likely be attacked on the basis that Medley did not intend to kill his wife. For this reason, the State asserted that there was "no better proof than the fact that later he tried to hire somebody to kill her, that there was an intent to kill, and then it would be admissible on that basis, whether it's joined for trial or not." In response, the defense stated:

> [W]e believe in order to try these offenses together, that the second charge [of solicitation to commit murder] . . . would be so unfairly prejudicial to Mr. Medley's first case, that it should not be joined to that. If Your Honor could put yourself in the place of a juror sitting up there, and you're hearing the evidence about Mr. Medley's possible talk to an inmate about possibly killing his wife, and whether that's true or not, that would make it seem more likely that the first charge would be true. We believe it would unfairly prejudice the jury . . . . .

After hearing arguments from both parties, the trial court ruled:

> I want to refer in part to State v. Denton, reported in 149 S.W.3d, Page 1, beginning on Page 1. I'm quoting from that case in part. The primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in a trial of the other, if the two counts of the indictment have been severed.

And the same test is applied for whether or not to join two separate indictments. Tennessee Rule[] of Evidence 404(b) prohibit[s] the admission of other crimes, wrongs or acts of the defendant when admitted only to show the defendant's propensity to commit the crime charged. However, Rule 404(b) does not bar the admission of acts alleged to be a part of a common scheme or plan when relevant to a material issue at trial.

Before a trial court may deny a severance request it must hold a hearing on the motion and conclude from the evidence and argument presented at the hearing that, first, the multiple offenses constitute part of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes. Three types of common scheme or plan evidence are recognized in Tennessee. First, the offenses that reveal distinctive design or are so similar as to constitute signature crimes – that obviously does not apply here – (2) offenses that are part of the larger, continuing plan of conspiracy – I think it does in this case – and (3) offenses that are all part of the same criminal transaction.

The Court finds in this case that the evidence of both crimes would be admissible in the trial of the others. It appears to the Court that its offer shows the intent of the second offense, [the solicitation to commit murder] offense shows the intent of Mr. Medley. It also – the Court finds it's part of a larger continuing plan or conspiracy. I realize there is some prejudicial effect in the case, but I do not think that the prejudicial effect [outweighs] by the admission of this evidence on the probative issues in this case.

In short, the Court finds that a joinder is proper in this case and will so allow.

Tennessee Rule of Criminal Procedure 8(b) states that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Tennessee Rule of Criminal Procedure 13(a) states that "[t]he court may order consolidation for trial of two or more indictments, presentments, or informations if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Nevertheless, Tennessee Rule of Criminal Procedure 14(b)(1) states that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

Here, the State sought to join offenses in multiple indictments upon a motion pursuant to Tennessee Rule of Criminal Procedure 13(a). "[W]hen a defendant objects to a pre-trial

consolidation motion by the state, the trial court must consider the motion by the severance provisions of Rule 14(b)(1), not the 'same or similar character' standard of Rule 8(b)." Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000). In other words, "the state must then demonstrate that the offenses are parts of a common scheme or plan and that evidence of each offense is admissible in the trial of the others." Id. at 444.

"[T]he 'primary issue' to be considered in any severance case is whether evidence of one offense would be admissible in the trial of the other if the two offenses remained severed." Id. at 445 (citing State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984)). Tennessee Rule of Evidence 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, "other crimes, wrongs or acts" are admissible under Rule 404(b) when they are alleged to be a part of a common scheme or plan that is relevant to a material issue at trial. See Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980).

"In Tennessee, there are three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3d ed. 1995)). As relevant in the case here, "[t]he larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose. State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993) (citing N. Cohen, Tennessee Law of Evidence, § 404.11 (2d ed. 1990)).

The Tennessee Supreme Court outlined the prerequisites for consolidation:

Before consolidation is proper, the trial court must conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan, Tenn. R.Crim. P. 14(b)(1); (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); [State v. ]Moore, 6 S.W.3d [235,] 239 [(Tenn. 1999)]; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3).

Spicer, 12 S.W.3d at 445. The court added that "because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." Id. The court also stated that "[a]s the comments to Rule of Criminal Procedure 8 make clear, the purpose of the severance provisions is to ensure that the defendant is insulated from the evidence of the other offenses when that evidence is not otherwise admissible." Id. at 446 (citing Tenn. R. Crim. P. 8, Advisory Comm'n Comments; Burchfield, 664 S.W.2d at 288).

A trial court's decision "to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) [is] to be reviewed for an abuse of discretion." Shirley, 6 S.W.3d at 247. "Therefore, a trial court's refusal to sever offenses will be reversed only when the 'court applied an incorrect legal standard,

or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (citing State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

In State v. Prentice, this court offered guidance in determining whether the failure to sever offenses constituted harmful or harmless error:

> "In most severance cases, 'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict. . . .' " Spicer, 12 S.W.3d at 447-48 (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)). Our supreme court has held that the error is harmful when, because the evidence of guilt was not overwhelming, the failure to sever offenses invited the jury to infer guilt from the propensity of the accused to commit crime. Shirley, 6 S.W.3d at 250-51. In Spicer, our high court concluded that, because the evidence of guilt was sufficient but not overwhelming, the failure to sever offenses required reversal. 12 S.W.3d at 447. This court, in State v. Michelle Ferguson, No. E1999-01302-CCA-R3-CD, 2000 WL 1100223[, at *12] (Tenn. Crim. App., at Knoxville, Aug. 3, 2000), held that the trial court's failure to sever was reversible error because "[a]lthough the evidence . . . was legally sufficient to support all three of [d]efendant's convictions, the evidence was far from overwhelming." Cf. State v. Michael Anderson Peek, No. E1998-00038-CCA-R3-CD, 2000 WL 565129[, at *13] (Tenn. Crim. App.[, at Knoxville,] May 3, 2000) (finding that the failure to sever was harmless where the evidence of the defendant's guilt was overwhelming).

113 S.W.3d 326, 332-33 (Tenn. Crim. App. 2001).

Here, the State argues that Medley's offenses were "part of a larger, continuing plan or conspiracy" to murder the victim. The proof at trial established that on April 17, 2007, Medley pointed a gun at the victim's forehead and chest before firing a shot over her head and next to her foot, shoved her into a refrigeration, hit her in the head with his hand, and threatened to kill the victim more than once before law enforcement arrived. On May 24, 2007, a little more than one month later, Medley approached the victim outside her home and told her, "You've cost me too much, bitch, and you're going to die." Then Medley cut the victim on her face, chest, shoulder, down one breast, twice on her left hand, and on her arm to her left shoulder. Deputy Craig testified that the victim's wounds were so deep that he believed that the victim would die. Officers who searched Medley's residence found a wet black T-shirt and some jeans with blood stains containing Medley's wallet and keys. Additionally, a pocketknife and a sharpening stone were found in Medley's car. Forensics tests showed that the stains on the jeans were the victim's blood. Between July and September 2007, Medley began talking to Antonio Goss, a fellow inmate, about his criminal cases involving the victim. Medley asked Goss what would happen if the victim failed to appear in court, and Goss told Medley that he would have an excellent chance of "getting off." Goss said Medley "made it perfectly clear that he wanted to have [the victim] killed[,]" but Goss told him that he should leave things alone. Goss agreed to wear a wire for the TBI and taped two different conversations with Medley. During these conversations, Medley talked to Goss about having an acquaintance of Goss's kill his wife in exchange for $2000 and how the hired killer would recognize the victim and how the killer would get paid.

In all three of these incidents, Medley's intent was to kill the victim. Medley argues that his statement regarding the IOU note should not have been admissible in the attempted murder case, had it been tried alone, because he was represented by counsel on related charges and because law enforcement approached him rather than Medley approaching law enforcement. He contends that since the statement should not have been admissible in the attempted murder case, then by implication, the statement should not have been admissible when the attempted murder case was joined to the other cases. However, Medley's argument depends upon a flawed theory – that his representation by counsel on related charges amounted to an invocation of his right to counsel under the Fifth Amendment, which should have precluded law enforcement from approaching him, thereby making his subsequent statement to Agent Jackson inadmissible. We have previously concluded that Medley's invocation of his Sixth Amendment right to counsel, at the point that he hired private counsel to represent him on the case related to the attempted murder charges, was not also an invocation of his Fifth Amendment right to counsel under Miranda and Edwards as to the other uncharged offense of solicitation to commit murder. See McNeil, 501 U.S. at 178-79, 111 S. Ct. at 2209; see also Cobb, 532 U.S. at 172-73, 121 S. Ct. at 1343-44. Furthermore, we conclude that the trial court did not abuse its discretion in determining that the offenses were part of a common scheme or plan and that evidence of each offense was admissible in the trial of the other offenses. See Shirley, 6 S.W.3d at 247; Tenn. R. Crim. P. 14(b)(1). We also agree with the trial court that Medley's three offenses were part of a larger, continuing plan or conspiracy to kill the victim. See Bunch, 605 S.W.2d at 229; Hallock, 875 S.W.2d at 290. Finally, we conclude that the trial court, before joining the offenses, properly determined at the consolidation hearing that the offenses constituted parts of a common scheme or plan, that the evidence of each offense was relevant to the material issue in the trial of the other offenses of Medley's intent to kill the victim, and that the probative value of the evidence of the other offenses was not outweighed by the prejudicial effect that admission of the evidence would have on the defendant. See Spicer, 12 S.W.3d at 445. We conclude that the trial court properly joined the offenses in this case. However, even if the trial court erred in joining the offenses, we conclude that such error was harmless because of the overwhelming evidence of Medley's guilt. See Prentice, 113 S.W.3d at 332-33. Accordingly, Medley is not entitled to relief on this issue.

**III. Sentence.** Relying on State v. Woods, 814 S.W.2d 378 (Tenn. Crim. App. 1991), called into doubt by State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), Medley argues that he received an excessive sentence because the trial court erred in imposing consecutive sentences. In addition, despite Medley's acknowledgment of the Tennessee Supreme Court's ruling in State v. Allen, 259 S.W.3d 671 (Tenn. 2008), he contends that pursuant to Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), the jury, rather than the trial court, must find the facts required to order a consecutive sentence. He further claims that because the United States Supreme Court granted certiorari on this issue in the case of Oregon v. Ice, 170 P.3d 1049 (Or. 2007), cert. granted, — U.S. — , 128 S. Ct. 1657 (U.S. Mar. 17, 2008) (No. 07-901), his case should be reconsidered or deferred until the United States Supreme Court renders a decision in the Ice case. In response, the State argues that the trial court did not err in imposing consecutive sentences. The State first asserts that Medley was released on bail for the aggravated assault charge at the time when he committed the attempted murder offense, which made consecutive sentencing regarding those offenses mandatory. See Tenn. R. Crim. P. 32(c)(3)(C). The State also asserts that the trial court properly ordered the solicitation to commit murder conviction consecutive to the aggravated assault and attempted murder

convictions because the trial court's findings supported the imposition of a consecutive sentence based on the dangerous offender category.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant, not the State, has the burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d) (2006), Sentencing Comm'n Comments. This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court may not disturb the sentence even if a different result was preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In this case, our review will be de novo with a presumption of correctness because the trial court considered the purposes and principles of the sentencing act as well as the relevant facts and circumstances in this case.

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006); State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008).

If a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a) (2006). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b).

However, the Sentencing Commission Comments of section 40-35-115(b) states that "[w]hile this section permits consecutive sentencing, the trial judge has other available options, such as increasing the length of their sentence within the appropriate range depending on the presence of enhancing factors." T.C.A. § 40-35-115(a) (2006), Sentencing Comm'n Comments. An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1) (2006). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2) (2006).

In part, the trial court ordered consecutive sentencing based on section 40-35-115(b)(4), "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Regarding this subsection, the Tennessee Supreme Court has stated:

Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.

State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (emphasis added) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Unlike the other six subsections, the trial court must make additional factual findings for the dangerous offender factor because it is "the most subjective and hardest to apply." Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)).

Here, the trial court made the following ruling regarding consecutive sentencing in Medley's case:

The State has correctly pointed out that there is a mandatory consecutive sentence in one of the cases. You were out on bond in Case No. 7-176. Again, the 176 was the aggravated assault which occurred in April. You were on bond at that time when you tried to kill your wife by cutting her on numerous occasions with a knife. And because of that, under Tennessee Rules of Criminal Procedure, 32(c)[(3)(C)], that must run consecutive. So, 7-176 is consecutive to 177.

The remaining issue is whether or not the sentence [for the solicitation to commit murder offense] in Case No. 7-233 should run consecutive to the other sentences. The State has filed numerous grounds for that, which are: Number 2 – again, this is under T.C.A. 40-35-115(b)[(2)], the defendant is an offender whose record of criminal activity is extensive. That is true because of numerous criminal acts you committed, all of which were directed toward killing your wife.

4(a), the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk of human life is high; . . . .

Mr. Medley, if you're not a dangerous offender, I've never seen one. I've never seen anyone make so many efforts to try to kill somebody else. And I'm satisfied that if you were out of jail today, that you would probably make another attempt.

4(b), the circumstances surrounding the commission of the offense were aggravated;

(c), confinement for an extended period of time is necessary to protect society;

and (d), the accurate length of sentence, if consecutive sentence is ordered, reasonably relates to the seriousness of the offenses for which the defendant stands convicted. That's true in part. Really, the sentence that you're going to receive is not nearly long enough for what you deserve.

In short, I'm going to run the sentence in 7-233 consecutive to the other sentences.

The sentences again are, for the attempted murder, 25 years; for the aggravated assault in April, 6 years; and the solicitation of murder while you were in jail is 12 years. If my math is correct, that is an effective sentence of 43 years.

And again, I want to urge the Parole Board, at whatever point in time they might consider you for parole, to look at the circumstances surrounding this sentence, and hopefully, you'll never get out of jail. If I had anything to do with it, that would be the situation.

Medley first argues that the trial court erred in classifying him as a dangerous offender based on State v. Woods, 814 S.W.2d 378 (Tenn. Crim. App. 1991). Here, the trial court ordered consecutive sentences based on Medley's extensive record of criminal activity under section 40-35-115(b)(2) and his classification as a dangerous offender under section 40-35-115(b)(4). In State v. Palmer, this court held that section 40-35-115(b)(2) allows a trial court to sentence a defendant to consecutive sentences, even in the absence of a prior record, if the defendant's convictions in the case at hand "indicate criminal activity so extensive and continuing for such a period of time as to warrant consecutive sentencing." 10 S.W.3d 638, 648 (Tenn. Crim. App. 1999) (quoting Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). Upon review of the record, we conclude that the trial court properly imposed consecutive sentences based on Medley's extensive record of criminal activity alone.

We also conclude that the trial court properly classified Medley as a dangerous offender under section 40-35-115(b)(4). Medley relies on the Woods case, which outlined four factors for

the dangerous offender classification, in challenging the trial court's classification of him as a dangerous offender:

> In summary, a defendant may not be required to serve multiple sentences consecutively on the ground he is a dangerous offender unless the record establishes that:
>
> (a) the defendant's behavior indicates "little or no regard for human life," and he did not hesitate "about committing a crime in which the risk to human life is high," Tenn. Code Ann. § 40-35-115(b)(4) (Supp. 1989);
>
> (b) the circumstances surrounding the commission of the offense are aggravated, Gray v. State, 538 S.W.2d at 393;
>
> (c) confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to "lead a productive life and [his] resort to criminal activity in furtherance of [his] anti-societal lifestyle," Gray v. State, 538 S.W.2d at 393; and
>
> (d) the aggregate length of the sentences, if consecutive sentencing is ordered, reasonably relates to the offenses of which the defendant stands convicted. State v. Taylor, 739 S.W.2d [227,] 230 [(Tenn. 1987)].

Woods, 814 S.W.2d at 380. We note that the decision in Woods was called into question by State v. Wilkerson, 905 S.W.2d at 938, which held that "[t]he decision in Woods is approved only to the extent that it applied the principles set forth in this opinion." The court added:

> [T]he imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed.

Id. at 939. The record shows that the trial court made the additional factual findings required of the dangerous offender classification regarding the severity of the offense and the need to protect the public from future acts of the defendant. The trial court stated that the imposition of consecutive sentences "reasonably relate[d] to the seriousness of the offenses." It also found that "confinement for an extended period of time is necessary to protect society." Finally, it determined that it had "never seen anyone make so many efforts to try to kill somebody else" and that if Medley were not incarcerated he "would probably make another attempt" to kill the victim. We conclude that the trial court properly applied the dangerous offender classification in ordering consecutive sentencing.

Medley additionally contends that the trial court's imposition of consecutive sentencing violated Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), especially given the United States Supreme Court's grant of certiorari to determine this issue in Oregon v. Ice, 170 P.3d 1049

(Or. 2007), <u>cert. granted</u>, — U.S. — , 128 S. Ct. 1657 (U.S. Mar. 17, 2008) (No. 07-901). We note that since the filing of the parties' briefs in this case, the United States Supreme Court rendered a decision in <u>Oregon v. Ice</u>, holding that the right to a jury trial does not include the right to a jury determination of consecutive sentencing and that the rulings in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000), and <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531 (2004), do not apply to the imposition of consecutive sentences. <u>See</u> <u>Oregon v. Ice</u>, — U.S. — , 129 S. Ct. 711, 717 (2009). Furthermore, <u>State v. Allen</u>, 259 S.W.3d 671 (Tenn. 2008), held that Tennessee's statute regarding consecutive sentencing did not violate <u>Apprendi</u> or <u>Blakely</u>:

> <u>Apprendi</u> and <u>Blakely</u> simply do not require the jury to determine the manner in which a defendant serves multiple sentences. That Tennessee's statutes require (in most instances) trial courts to make specific factual findings before imposing consecutive sentences does not extend the reach of <u>Apprendi</u> and <u>Blakely</u>. The Defendants' reliance on these cases is therefore misplaced.

<u>Id.</u> at 690. The <u>Allen</u> court also approved this court's analysis in <u>State v. Joseph Wayne Higgins</u> regarding this issue:

> The manner of service of the sentence imposed when a trial court decides whether to impose consecutive sentences–a decision it may make only after the jury has found the defendant guilty of multiple offenses beyond a reasonable doubt–does not usurp the jury's factfinding powers or offend the defendant's due process rights.

<u>Id.</u> (quoting <u>State v. Joseph Wayne Higgins</u>, No. E2006-01552-CCA-R3-CD, 2007 WL 2792938, at *14 (Tenn. Crim. App., at Knoxville, Sept. 27, 2007)). Therefore, it is clear that Tennessee's statute regarding consecutive sentencing does not violate the United States Constitution or the Tennessee Constitution. <u>See</u> <u>Ice</u>, — U.S. — , 129 S. Ct. at 717; <u>Allen</u>, 259 S.W.3d at 690. Accordingly, Medley is not entitled to relief on this issue.

## CONCLUSION

Upon review of the record, we conclude that the trial court did not err in refusing to suppress Medley's statement, in joining the offenses, or in imposing consecutive sentences. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE